CHRISTOPHER A. SEEGER, ESQ.*
cseeger@seegerweiss.com
STEPHEN A. WEISS, ESQ.*
sweiss@seegerweiss.com
DAVID R. BUCHANAN, ESQ.*
dbuchanan@seegerweiss.com
JUSTIN M. SMIGELSKY, ESQ.*
jsmigelsky@seegerweiss.com
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Tel:  (973) 639-9100
*Pro hac vice* forthcoming

BRIAN KABATECK, SBN 152054
bsk@kbklawyers.com
SHANT KARNIKIAN, SBN 285048
sk@kbklawyers.com
MARINA PACHECO, SBN 296485
mrp@kbklawyers.com
**KABATECK LLP**
601 South Figueroa Street, Suite 2600
Los Angeles, CA 90017
Tel:  (213) 217-5000

*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| SHANNON SANTOS, JOHN MAKIEIL, and DARLINGTON INVESTMENT GROUP, LLC, on behalf of themselves and all others similarly situation, | CASE NO. 8:26-cv-01372<br><br>**CLASS ACTION COMPLAINT** |

3
CLASS ACTION COMPLAINT

Plaintiffs,

v.

GKN AEROSPACE TRANSPARENCY SYSTEMS INC., GKN AEROSPACE SERVICES LIMITED, and MELROSE INDUSTRIES PLC,

Defendants.

**JURY TRIAL DEMANDED**

Plaintiffs Shannon Santos, John Makieil, and Darlington Investment Group, LLC ("Plaintiffs"), individually and on behalf of a putative class of all others similarly situated ("Class Members" or the "Class"), bring this class action suit for damages and equitable relief against GKN Aerospace Transparency Systems Inc., GKN Aerospace Services LTD., and Melrose Industries PLC (collectively "Defendants").

Plaintiffs allege the following based upon personal information as to allegations regarding themselves, the investigation of their counsel and review of public documents and information, and on information and belief as to all other allegations.

## I.    NATURE OF THE ACTION

1.    This Class Action seeks redress for residents, property owners, and employees living, working, and/or located in and around the ongoing "chemical

4
CLASS ACTION COMPLAINT

storage tank crisis" beginning on or about Thursday, May 21, 2026, that resulted in, among other things, mandatory evacuation  costs, loss of use and enjoyment of property, property damage, exposure to toxic material, inconvenience, disruption, and economic damages as alleged more specifically below.

2.     Defendants GKN Aerospace Transparency Systems Inc. and GKN Aerospace Services LTD. are global multi-technology leaders in the aerospace industry, managed as part of the global operations of Defendant Melrose Industries PLC.

3.     In light of disturbing events in May 2026, Defendants' brand has been stained with the ominous announcement by an Orange County California fire official on May 22, 2026, that a chemical storage tank located at Defendants' Garden Grove, California facility would either leak up to 7,000 gallons of toxic chemical onto the property or…explode.[1]

4.     The chemical—methyl methacrylate (known as MMA)—is a highly volatile, flammable and reactive chemical, used in plastics, coatings, and manufacturing (e.g., plexiglass), which Defendants use, maintain, store, handle, dispose of, and release for their production of aircraft components.

---

[1] *Garden Grove plant with chemical emergency is leading maker of aviation windows, canopies.*; *What we know about GKN Aerospace, the firm at center of O.C. chemical leak*, Los Angeles Times, May 23, 2026, available at: https://www.latimes.com/california/story/2026-05-23/garden-grove-chemical-leak-what-we-know-about-gkn-aerospace (last visited May 25, 2026).

5.      MMA is known to cause irritation to the human body—including to the skin, eyes, and mucous membranes—allergic response, respiratory effects—including chest tightness, dyspnea, coughing, wheezing, and reduced peak flow—neurological damage, dizziness, irritability, difficulty with concentration and reduced memory, damage to the developing fetus, and damage to the lungs, liver, and kidneys.

6.      MMA is a fire and explosion hazard.

7.      Consequently, on Thursday, May 21, 2026, the Orange County Sheriff's Department issued a mandatory evacuation order for the release of hazardous vapor release. The mandatory evacuation was expanded on May 22 "due to changes in the incident."[2]

8.      As of May 25, 2026, approximately 800 state and local first responders—toxicologists, hazmat teams, and public health sheltering experts—had been deployed in response to the "crisis situation" (the "Chemical Crisis") and tens of thousands (estimated to be 50,000) of southern Californians near the chemical tank at Defendants' Garden Grove facility had been ordered to evacuate immediately for their safety.[3]

---

[2] Orange County, California official website, https://www.ocgov.com/page/garden-grove-chemical-spill-incident.

[3] *Threat of catastrophic vapor blast is gone, but other dangers loom near a massive chemical tank in California*, CNN, May 25, 2026, available at:

6
CLASS ACTION COMPLAINT

9. On Monday, May 25, California Governor Gavin Newsom announced that President Donald Trump signed a presidential emergency declaration for the crisis.

10. Although the extent of leakage, if any, is unknown as of the date of this Complaint, residents have reported symptoms of exposure, including throat and nasal irritation, and headaches and dizziness, while 13 schools have closed "until further notice" and switched to online learning as a precaution.

11. As a result of this incident, Plaintiffs and Class Members suffered and will continue to suffer real property damage, mandatory evacuation costs and other out-of-pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, disruption, exposure to toxic material, an increased risk of associated illness or disease, and the present need for medical monitoring to ensure early detection of any such illness or disease.

## II. JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; more than 100 Class members

---

https://www.cnn.com/2026/05/24/us/california-orange-county-evacuation-what-we-know-hnk (last visited May 25, 2026).

CLASS ACTION COMPLAINT

are involved; and many members of the proposed Classes are citizens of different states than Defendant.

13.   This Court has personal jurisdiction over Defendants because they regularly engage in business within the state of California, were engaged in business within the state of California prior to and at the time of the Chemical Crisis, and because the claims asserted herein arise from the business activities and tortious conduct of Defendants within the state of California prior to and at the time of the Chemical Crisis.

14.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the actions and inactions giving rise to Plaintiffs' claims occurred in this District and all Class Members were injured because of tortious activity in this District.

## III.   THE PARTIES

### A.   Plaintiffs

15.   Plaintiff Shannon Santos ("Plaintiff Santos") is the owner of a residence located at 7735 Briarglen Loop, Unit B, Garden Grove, California, less than one mile away from Defendants' Garden Grove facility, as depicted below, where he resides with his wife and two pet cats.

CLASS ACTION COMPLAINT



16.    On Thursday, May 21, 2026, as the result of the Chemical Crisis, Plaintiff Santos, his wife, and two pet cats were forced to evacuate their home located at 7735 Briarglen Loop, Unit B, Garden Grove. Subsequently, following their return to their home on the evening of May 21, Plaintiff Santos, along with his wife and pets, was forced again to evacuate their home on Friday May 22, 2026. Notwithstanding a later reduction to the evacuation zone, Plaintiff Santos was restricted from returning to his home from Friday, May 22, until he was permitted to return to his home on the evening of May 26, 2026. Plaintiff Santos has incurred out-of-pocket expenses due to the forced evacuation, including necessary purchase of clothing items and toiletries, and it will be necessary upon his return to discard and re-purchase all perishable food items.

9

CLASS ACTION COMPLAINT

17.     Plaintiff John Makieil ("Plaintiff Makieil") is the owner of a residence located at 7692 Carla Street, Garden Grove, California, less than one mile away from Defendants' Garden Grove facility, as depicted below, where he resides with his wife, children, mother-in-law, pet dog, and two pet cats.



18.     On Thursday, May 21, 2026, as the result of the Chemical Crisis, Plaintiff Makieil, family, and pets were forced to evacuate their home located at 7692 Carla Street, Garden Grove. Subsequently, following their return to their home on the evening of May 21, Plaintiff Makieil, family, and pets were forced again to evacuate their home on Friday May 22, 2026. Notwithstanding a later reduction to the evacuation zone, Plaintiff Makieil was restricted from returning to his home from Friday, May 22, until he was permitted to return to his home on the evening of May

10
CLASS ACTION COMPLAINT

26, 2026. Plaintiff Makieil was forced to miss work as the result of the forced evacuation. Plaintiff Makieil has incurred out-of-pocket expenses due to the forced evacuation, including necessary purchase of clothing items and toiletries, and it will be necessary upon his return to discard and re-purchase all perishable food items.

19.     Plaintiff Darlington Investment Group, LLC ("Plaintiff GG Express") owns and operates a car wash located at 8034 Garden Grove Boulevard, Garden Grove, California, less than one mile away from Defendants' Garden Grove facility, as depicted below, where it conducts its business.



20.     On Friday, May 22, 2026, as the result of the Chemical Crisis, Plaintiff GG Express was forced to close its business. As examples, barricades restricted cars from transgressing nearby streets and employees and customers were prohibited from accessing the business. For the duration of the mandatory evacuation period, until the morning of  May 27, 2026, Plaintiff GG Express was unable to operate,

11
CLASS ACTION COMPLAINT

causing personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, disruption, and exposure to toxic material.

**B.   Defendants**

21.   Defendant GKN Aerospace Transparency Systems Inc. is a California corporation with a principal address of 12122 Western Avenue, Garden Grove, California 92841. Upon information and belief, GKN Aerospace Transparency Systems Inc. is a wholly owned subsidiary of Defendant Melrose Industries PLC.

22.   Defendant GKN Aerospace Services Limited is a private limited company organized under the laws of the United Kingdom, with a registered office address of 11th Floor The Colmore Building, Colmore Circus Queensway, Birmingham, B4 6AT, and its U.S. headquarters located at 1301 Solana Boulevard, Suite 1528, Westlake, Texas 76262. Defendant GKN Aerospace Services Ltd. is a wholly owned subsidiary of Defendant Melrose Industries PLC.

23.   Defendant Melrose Industries PLC is a public limited company organized under the laws of the United Kingdom, with a registered office address of 11th Floor The Colmore Building, Colmore Circus Queensway, Birmingham, B4 6AT, and its U.S. headquarters located at 1301 Solana Boulevard, Suite 1528,

12
CLASS ACTION COMPLAINT

Westlake, Texas 76262. Defendant Melrose Industries PLC is the parent company of GKN Aerospace Services Ltd. and GKN Aerospace Transparency Systems Inc.

24.     At all times relevant hereto, Defendants GKN Aerospace Services Limited and Melrose Industries PLC exercised management, direction, and control over the business and relevant operations of Defendant GKN Aerospace Transparency Systems Inc.

25.     Unless the context otherwise requires, Defendants GKN Aerospace Transparency Systems Inc., GKN Aerospace Services Limited, and Melrose Industries PLC are collectively referred to as "GKN Aerospace" or "Defendants."

## IV.     FACTUAL ALLEGATIONS

### A.     Defendants' Aerospace Business

23.     Defendants' massive aerospace operation began in 1759 as an ironworks business in South Wales. Through the centuries, Defendants have evolved into an international supplier of jet engines, landing gear, plane bodies and airplane windows, known as transparencies.[4]

---

[4] *Garden Grove plant with chemical emergency is leading maker of aviation windows, canopies*, The Orange County Register, May 22, 2026, available at: https://www.ocregister.com/2026/05/22/garden-grove-plant-leading-maker-of-worldwide-aviation-windows-canopies/ (last visited May 26, 2026).

13
CLASS ACTION COMPLAINT

24.    GKN Aerospace states on its website that it is "a global multi-technology leader in the aerospace industry."[5] "If you've ever flown in a window seat, there's a good chance you were peering out of a GKN product."[6]

25.    GKN Aerospace describes its global business on its website[7]:

> With 32 manufacturing locations in 12 countries, we serve over 90% of the world's aircraft and engine manufacturers, specialising [sic] in the development and delivery of cutting-edge aerostructures and engine systems. Our unrivalled products, systems, and services are integral to the vast majority of today's commercia and defence [sic] aircraft ranging from helicopters, business jets, passenger planes and advanced air mobility vehicles to state-of-the-art fighter aircraft. Our mission is to be the most trusted and sustainable partner in the sky.

26.    According to its Annual report and financial statements filed December 31, 2024:

> GKN Aerospace Services Limited is the UK trading subsidiary of the Melrose Industries PLC Group ("Melrose"). Melrose is a leading global tier one supplier of airframe and engine structures, landing gear, electrical interconnection systems, transparencies, and aftermarket services. It supplies products and services to a wide range of commercial and military aircraft and engine prime contractors, and other tier one suppliers. With 32 manufacturing locations in 12 countries, Melrose serves over 90% of the world's aircraft and engine manufacturers, specializing [sic] in the development and

---

[5] https://www.gknaerospace.com/.

[6] *Garden Grove plant with chemical emergency is leading maker of aviation windows, canopies.*

[7] *Id.*

CLASS ACTION COMPLAINT

delivery of cutting-edge aerostructures and engine systems.

27.    GLK Aerospace further states in its Annual report and financial statements: "The Company's operations are managed as part of the global operations of Melrose."

28.    Melrose's 2025 annual report[8] depicts its "global presence" as follows:



29.    GKN Aerospace maintains its Garden Grove location, the site germane to the instant matter, at 12122 Western Avenue, Garden Grove, California.

---

[8] Available at: https://www.melroseplc.net/investors/results-reports-and-presentations/.

15
CLASS ACTION COMPLAINT

30.    GKN Aerospace describes its Garden Grove, California location as "the world's leading provider of military transparency systems and commercial aircraft transparencies."[9] According to its website[10]:

> The [Garden Grove] site offers a full range of capabilities for design, analysis, testing and certification of military canopies, cockpit windows and passenger windows. GKN Aerospace manufacturers the world-leading F-35 canopy from its Garden Grove facility, as well as transparencies for the Boeing 787 Dreamliner and 747, the Airbus A350, HondaJet and Bombardier C-Series.

31.    With respect to the Garden Grove, California location, Melrose boasts in its 2025 annual report, "During the year, our Garden Grove facility achieved a number of milestones, including the delivery of the 2,500th F-35 canopy and 1,000th CH-53K transparency. The site also moved its F-35 canopy facility expansion project into full execution, with the goal to be fully operational in the second half of 2027."

32.    With respect to "Health and Safety," Melrose states in its 2025 annual report:

> Safety is embedded in our culture and management systems and underpinned by strong governance principles, clear policies and consistent controls across the Group. Continued investment in equipment, training and

---

[9] https://www.gknaerospace.com/locations/americas/usa/?office=gardengrovecalifornia.

[10] *Id.*

16
CLASS ACTION COMPLAINT

capability supports safe working practices, while a strong emphasis in incident prevention, near-miss reporting and hazard identification and awareness reinforces proactive risk management. Behaviour-based programmes [sic] and ongoing training and awareness campaigns remain central to strengthening sales performance.

33.    With respect to its "Community Impact," Melrose states in its 2025 annual report: "We believe our responsibilities extend beyond our business operations. Supporting the communities in which we operate is an integral part of our corporate ethos."

**B.    Methyl Methacrylate (MMA)**

34.    Defendants use, maintain, store, handle, dispose of, and release methyl methacrylate (MMA) for their production of aircraft components.

35.    MMA is a clear, highly reactive organic compound (formula $CH_2 = C(CH_3)COOCH_3$) used in plastics, coatings, and manufacturing.[11]

36.    MMA is widely used to manufacture a range of shatter-resistant acrylic materials such as plexiglass, as well as a variety of resins, coatings, and adhesives. MMA is also used by dentists to make dental materials such as crowns and fillings as well as by surgeons to make bone cement for some orthopedic procedures.

---

[11] *See, e.g.,* https://www.cdph.ca.gov/Programs/OPA/Pages/CAHAN/Information-On-Methyl-Methacrylate.aspx and https://en.wikipedia.org/wiki/Methyl_methacrylate (last visited May 24, 2026).

17
CLASS ACTION COMPLAINT

37.     MMA is a highly volatile, flammable and reactive chemical. MMA is a fire and explosion hazard.

38.     According to the California Department of Public Health[12]:

> MMA is dangerous because it is toxic, flammable, and under certain conditions, can begin to react with itself in a process called polymerization. This reaction can generate heat and pressure, which may cause liquid to vaporize and be released into the air. If temperatures rise or MMA is not properly contained or handled, the vapors may also ignite or explode.

39.     MMA is a known irritant to the skin, eyes, and mucous membranes in humans. An allergic response to dermal exposure may develop, while respiratory effects have been reported in humans following acute (short-term) and chronic (long-term) inhalation exposures.[13]

40.     Respiratory symptoms observed following acute exposures include chest tightness, dyspnea, coughing, wheezing, and reduced peak flow.[14]

41.     Neurological symptoms have also been reported in humans following acute exposure to MMA.[15] MMA may damage the nervous system causing numbness, "pins and needles," and weakness in the hands and feet.

---

[12] https://www.cdph.ca.gov/Programs/OPA/Pages/CAHAN/Information-On-Methyl-Methacrylate.aspx (last visited May 25, 2026).

[13] *See, e.g.,* U.S. Environmental Protection Agency, Methyl Methacrylate (80-62-6), created April 1992, updated January 2000.

[14] *Id.*

[15] *Id.*

18
CLASS ACTION COMPLAINT

42.   High exposure can cause dizziness, irritability, difficulty with concentration and reduced memory.

43.   MMA is also known to affect the lungs, liver, and kidneys, and could damage the developing fetus.

44.   Exposure to MMA also presents serious health hazards to animals, such as damage to the lungs, and developmental and reproductive toxicity including, without limitation, increased fetal deaths in exposed populations.

**C.   Chemical Storage Tank Crisis**

45.   On or about Thursday, May 21, 2026, a chemical tank containing 7,000 gallons of MMA at Defendants' Garden Grove facility began to show "signs of trouble" when temperature and pressure escalated inside the tank.[16]

46.   "Effective 1841 hrs [sic] on Thursday, May 21, 2026, the Orange County Sheriff's Department issued an Evacuation Order (Mandatory) for hazardous materials (vapor) release. On Friday, May 22, 2026 at 0607 hrs [sic], additional evacuation orders for impacted areas were launched due to changes in the incident."[17]

---

[16] *Threat of catastrophic vapor blast is gone, but other dangers loom near a massive chemical tank in California*, CNN, May 25, 2026, available at: https://www.cnn.com/2026/05/24/us/california-orange-county-evacuation-what-we-know-hnk (last visited May 25, 2026). Some reports indicate that the subject tank maintained by Defendants contains 34,000 gallons of MMA.

[17] Orange County, California official website, https://www.ocgov.com/page/garden-grove-chemical-spill-incident.

47.     Consequently, emergency crews throughout Orange County, California were caused to work nonstop in an effort to prevent an overheating tank filled with a toxic chemical, MMA, from leaking or triggering a catastrophic explosion.[18]



48.     Depicted immediately below is an image of water being sprayed on the overheating tank at the Garden Grove facility in response to the Chemical Crisis[19]:

---

[18] *Officials race to cool down tank containing toxic chemical as 50,000 residents remain under evacuation order in California*, CNN, May 24, 2026, available at: https://www.cnn.com/2026/05/22/us/chemical-spill-orange-county-california (last visited May 25, 2026).

[19] Ethan Swope/AP, available at: https://www.cnn.com/2026/05/22/us/chemical-spill-orange-county-california.

20
CLASS ACTION COMPLAINT

49.     The potential consequences of increased heat or pressure teetered between two dreaded scenarios: a chemical leak that would infiltrate the soil and air with toxic material, or a devastating blast that could destroy or damage homes and businesses. Consequently, authorities rushed in an effort to keep the tank as cool as possible to keep the chemical reactions happening inside the tank stabilized.

50.     Craig Covery, a division chief with the Orange County Fire Authority (OCFA) and the incident commander, said of the two possible scenarios: "One, it fails and cracks, and all the product leaks out onto the ground" and efforts are underway to try to prevent the liquid from "getting into the storm drains and the river channels and into our oceans." "Or, it will explode," he said.[20]

_____

[20] *What we know about GKN Aerospace, the firm at center of O.C. chemical leak*, Los Angeles Times, May 23, 2026, available at:

21
CLASS ACTION COMPLAINT

51.     According to Chief Covey, "A couple things could happen…The tank could crack and start spilling out all that 7,000 gallons of chemical, or there could be a catastrophic explosion and the other two tanks would be affected as well."[21]

52.     Chief Cover further explained, "This is going to happen unless some brilliant guy behind me figures out how we can mitigate this incident. This thing is going to fail…People need to get out of their houses and get into a safe space because when this thing goes, depending on the wind direction it's going, we cannot control the weather. This is highly volatile, it's highly toxic and it's highly flammable."[22]

53.     Congressman Derek Tran stated on May 22 that he had spoken with the Defendants' leadership and had "urged the company to take full responsibility for the panic and disruption that tens of thousands of residents are currently experiencing."[23]

54.     According to California Governor Gavin Newsome, "[t]he safety of Orange County residents is the top priority. We are mobilizing every state resource available to support local responders and make sure the community has what they

___

https://www.latimes.com/california/story/2026-05-23/garden-grove-chemical-leak-what-we-know-about-gkn-aerospace (last visited May 25, 2026).

[21] *Officials race to cool down tank containing toxic chemical as 50,000 residents remain under evacuation order in California.*

[22] *Id.*

[23] *Id.*

22
CLASS ACTION COMPLAINT

need to stay safe." On May 23, Governor Newsom issued a state of emergency proclamation for Orange County "as the state continues to assist in local response efforts following [the] hazardous chemical incident at [GKN's] aerospace facility that has resulted in the evacuation of tens of thousands of residents from the surrounding area."[24]

55.    As of May 25, 2026, approximately 800 state and local first responders—toxicologists, hazmat teams, and public health sheltering experts—had been deployed in response to the "crisis situation," and tens of thousands (estimated to be 50,000) of southern Californians near the chemical tank at GKN Aerospace had been ordered to evacuate immediately for their safety.[25] Depicted below is an image of the evacuation area as determined by the OCFA, an area covering approximately nine square miles surrounding Defendant's facility (the "Evacuation Zone"):

[24] *Governor Newsom proclaims state of emergency in Orange County in response to ongoing chemical incident in Garden Grove, makes additional shelter sites available,* https://www.gov.ca.gov/2026/05/23/governor-newsom-proclaims-state-of-emergency-in-orange-county-in-response-to-ongoing-chemical-incident-in-garden-grove-makes-additional-shelter-sites-available/ (last visited May 25, 2026).

[25] *Threat of catastrophic vapor blast is gone, but other dangers loom near a massive chemical tank in California*, CNN, May 25, 2026, available at: https://www.cnn.com/2026/05/24/us/california-orange-county-evacuation-what-we-know-hnk (last visited May 25, 2026).



Note: Evacuation area as of May 25, 2026, at 12 p.m. ET

Sources: City of Garden Grove, OpenStreetMap
Graphic: Renée Rigdon, CNN

56.    To effectuate the evacuation order, the Garden City Police Department "went door to door" directing people to leave and posted on social media.

57.    As depicted in the image below, the evacuation zone covers the area north of Trask Avenue, south of Ball Road, east of Valley View Street and west of Dale Street, along with small portions of West Anaheim, Cypress and Buena Park, and the city of Stanton.



58.    The OCFA also notified neighboring areas of the blast zone and which

areas are at risk of severe structural damage and significant harm in the event of

CLASS ACTION COMPLAINT

an explosion, including identifying a "red zone" where fires could occur, along with an "orange zone" where residents face conditions "dangerous to life and health" where exposure to the MMA chemical could cause injury.

59.     On Monday, May 25, California Governor Gavin Newsom announced that President Donald Trump signed a presidential emergency declaration for the crisis.

60.     Upon information and belief, MMA vapors, particulates, residues, contaminants, and/or airborne chemical byproducts physically migrated and continue to migrate onto and into Plaintiffs' and Class Members' real property, personal property, structures, outdoor surfaces, vegetation, and soil.

61.     Although the extent of leakage, if any, is unknown as of the date of this Complaint, residents have reported symptoms of exposure, including throat and nasal irritation, and headaches and dizziness, 13 schools have closed "until further notice" and switched to online learning as a precaution, and businesses in the vicinity were forced to shutter.

62.     After a crack was discovered in the tank, emergency crews worked overnight on May 24 into May 25 on a risky mission to confirm if the pressure in the tank was releasing. Early reports indicate that the threat of a BLEVE—Boiling Liquid Expanding Vapor Explosion—had been minimized as the result of the mission. However, officials clarified that the crisis at the Garden Grove facility is

CLASS ACTION COMPLAINT

not over. According to OCFA Interim Fire Chief T.J. McGovern, "We still have potential for an explosion that [is] not as bad as a BLEVE, but it's still a threat. There was still a threat out there, and we need the public to keep to those evacuation zones until we deem it safe for them to come back."[26]

63. Defendants issued an apology for the Chemical Crisis, stating on the GKN Aerospace website, in pertinent part: "We apologize for the ongoing disruption this incident is causing and our priority remains its safe resolution, so that residents can return to their homes as quickly as possible. Please continue to follow all instructions issued by local authorities and emergency personnel at this time."[27]

**D.    Damages to Property Owners, Residents and Businesses**

64. Thousands of residents, property owners, and employees have been and will continue to be impacted by Defendants' release of MMA and the responding evacuation orders.

65. As a result of this incident, Plaintiffs and Class Members presently suffer and will continue to suffer real property damage, mandatory evacuation costs and other out-of-pocket expense, personal property damage, loss of use and

---

[26] *'Cris is not averted,' smaller explosion or leak still possible, officials say*, ABC7 Eyewitness News, May 25, 2026, available at: https://abc7.com/live-updates/garden-grove-chemical-tank-emergency-leaking-toxic-chemicals-orange-county-will-spill-explode-officials-say/19152918/ (last visited May 25, 2026).

[27] https://www.gknaerospace.com/.

enjoyment of property, diminution in property value, annoyance, upset, aggravation, inconvenience, disruption, exposure to toxic material, an increased risk of associated illness or disease, and the present need for medical monitoring to ensure early detection of any such illness or disease.

## V.   CLASS ACTION ALLEGATIONS

66.   Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and, as warranted, 23(c)(4) on behalf of themselves and the following class of persons and organizations similarly situated for all direct, proximate, and foreseeable losses caused by the May 2026 Chemical Crisis. The proposed Classes (collectively, the "Class") are hereby defined as follows:

**Residents Class**: All individuals who resided within the Evacuation Zone as defined by the OCFA during the mandatory evacuation period (from May 22, 2026, to May 26, 2026).

**Property Owners Class**: All individuals who owned or otherwise had a legal interest in real property located within the Evacuation Zone as defined by the OCFA during the mandatory evacuation period (from May 22, 2026, to May 26, 2026).

**Employees Class**: All individuals or legal entities who owned or operated a business within the Evacuation Zone as defined by the OCFA during the mandatory evacuation period (from May 22, 2026, to May 26, 2026).

**Business Class:** All individuals or legal entities who owned or operated a business within the Evacuation Zone as defined by the OCFA during the mandatory evacuation period (from May 22, 2026, to May 26, 2026).

67.    Excluded from the Class(es) are: (1) Defendants and any of their affiliates, parents or subsidiaries; all employees of Defendants; all persons who make a timely election to be excluded from the Class(es); and the judges assigned to this case, their immediate families, and court staff; and (2) insurers and insurance syndicates whose claims for damages regarding the May 2026 chemical storage tank crisis at GKN Aerospace's Garden Grove facility, arise out of a right of subrogation, whether equitable, contractual or otherwise.

68.    Also excluded from the Class(es) are any claims of physical manifestation of personal or bodily injury.

69.    Plaintiffs reserve the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

70.    The claims of all Class members derive directly from a single course of conduct by Defendants. Defendants engaged and continue to engage in uniform and standardized conduct toward the putative Class members. Defendants do not differentiate, in degree of care or candor, in its actions or inactions, or the content of its statements or omissions, among individual Class members.

CLASS ACTION COMPLAINT

71.    Certification of Plaintiffs' claims is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

**A.    Numerosity and Ascertainability**

72.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous that the joinder of all members is impractical.

73.    While the exact number of Class Members is unknown to Plaintiffs at this time, it is ascertainable; the proposed Class includes thousands of residents and businesses who were unlawfully exposed to MMA or who had property contaminated by unlawful exposure to MMA and suffered damages. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

74.    The Classes are ascertainable because their members can be readily identified using public or business records, including other information kept by Defendant in the usual course of business and within their control or Plaintiffs and the Classes themselves.  Plaintiffs anticipate providing appropriate notice to the

30
CLASS ACTION COMPLAINT

Classes to be approved by the Court after class certification, or pursuant to court order.

**B.    Predominance of Common Issues**

75.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because this action involves common questions of law or fact that predominate over questions affecting only individual Class Members.

76.    Questions of law and fact common to Plaintiffs and the Classes include, without limitation:

      a.    Whether Defendants' acts or omissions as set forth herein caused or contributed to the resulting contamination and evacuation orders;

      b.    Whether Defendants were negligent in their use, maintenance, storage, handling, disposal and/or release of MMA for their production of aircraft components;

      c.    Whether MMA used, maintained, stored, handled, disposed of and/or released by Defendants escaped Defendants' control;

      d.    Whether Defendants breached their duty of reasonable care in their use, maintenance, storage, handling, disposal and/or release of MMA;

e.  Whether Defendants are strictly liable for injuries and damages suffered by Plaintiffs and the Classes because Defendants engaged in abnormally dangerous and/or ultrahazardous activity by their use, maintenance, storage, handling, disposal and/or release of MMA;

f.  Whether Defendants violated California statutory nuisance law by emitting air contaminants and/or endangering the health, safety, or welfare of the public, causing unreasonable injury or damage to property;

g.  Whether Defendants created a private nuisance through their acts and omissions, including by the release of a toxic contaminant;

h.  Whether Defendants created a public nuisance through their acts and omissions, including by the release of a toxic contaminant;

i.  Whether Defendants committed trespass on the property of Plaintiffs and the Classes by their acts and omissions, including by causing MMA to enter and contaminate said property;

j.  Whether Defendants committed trespass to the chattels of Plaintiffs and the Classes through their acts and omissions, including by impairing the property as to its condition, quality, or value; depriving Plaintiffs and the Classes of the possession

CLASS ACTION COMPLAINT

or use of their chattels for a substantial time; or causing harm to the property;

k.    Whether the Plaintiffs and the Classes have suffered a loss of use and enjoyment of property, property damage, diminution of property value, extra expenses or other economic damages as a result of the Defendants' acts or omissions as set forth above;

l.    Whether Defendants' conduct constitutes gross negligence or willful and wanton conduct, including related to the use, maintenance, storage, handling, disposal and/or release of MMA;

m.    Whether Plaintiffs' and the Classes' businesses have suffered a loss of income and/or diminution in value due to either (i) the release of MMA or (ii) the stigma associated with being within the evacuation zone;

n.    Whether Plaintiffs and the Classes have suffered damages to their businesses due to the Chemical Crisis and subsequent events, including forced evacuation and/or closing;

o.    Whether medical monitoring is an appropriate remedy that should be imposed to provide early detection of future injuries and other benefits to Plaintiffs and the Classes;

33
CLASS ACTION COMPLAINT

      p.      Whether monitoring of the diminution in value of Plaintiffs, including the stigma, on the value of the property of Plaintiffs and the Classes is an appropriate remedy; and

      q.      Whether Plaintiffs and the Classes are entitled to relief for the damages caused by Defendants.

77.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of all the Class members.  Identical statutory violations and business practices and harms are involved.  Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

**C.    Typicality**

78.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the Class Members and arise from the same course of conduct by Defendants.

79.     Plaintiffs own property, reside in, work and/or operate a business within the Class Zone surrounding the Chemical Crisis at or about Defendants' Garden Grove, California facility, and owned property, resided in, worked and/or operated a business in the Class Zone for at all relevant times.

80.     Plaintiffs' claims are based upon the same legal theories as those of the other Class Members.

CLASS ACTION COMPLAINT

81.    Plaintiffs and the other Class Members sustained damages as a direct and proximate result of the same wrongful acts or omissions in which Defendants engaged.

82.    Plaintiffs' damages and injuries are akin to those of Class Members, and Plaintiffs seek relief consistent with the relief of Class Members.

**D.    Adequacy**

83.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs have retained counsel with substantial experience in prosecuting complex class action and environmental toxic tort litigation, including successful class actions involving mass displacements caused by the release of dangerous substances as at issue here.

84.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class Members and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class Members.

85.    Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the interests of Class Members.

35
CLASS ACTION COMPLAINT

### E.    Superiority and Predominance

86.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient group-wide adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct predominate over any questions affecting only individual Class Members.

87.    Because the damages suffered by certain individual Class Members may be relatively small, the expense and burden of individual litigation would make it very difficult for all individual Class Members to redress the wrongs done to each of them individually, such that many Class Members would have no rational economic interest in individually controlling the prosecution of specific actions. Moreover, the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

88.    The prosecution of this case as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class Member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed

by the benefits to the legitimate interests of the parties, the Court, and the public, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

89.     Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority, discretion, and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

F.     **Medical Monitoring Class Injunctive Relief Pursuant to Rule 23(b)(2)**

90.     In addition, Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Classes and that require court imposition of uniform relief, thereby making appropriate equitable relief to the Classes as a whole within the meaning of Rules 23(b)(2).

91.     As set forth above, Plaintiffs are not asserting damages claims for the physical manifestation of a current toxicity injury, and have no adequate remedy at law, rendering declaratory, injunctive, and other equitable relief appropriate.

92.     Plaintiffs seek equitable relief in the form of a medical monitoring program and establishment of a medical monitoring fund, and further request injunctive relief compelling Defendants to finance the medical monitoring program and address issues as they develop during program administration.

93.     As a direct and proximate result of Defendants' wrongful conduct as set forth above, Plaintiffs and the Class Members have actually been exposed, and will continue to be exposed, to a toxic substance and fumes and thereby suffer, and will continue to suffer a significantly increased risk of serious injury, illness, and diseases as alleged herein. This increased risk is such that a reasonable physician would order medical monitoring, including but not limited to periodic diagnostic medical testing and necessary examinations.

94.     Early detection and treatment of illnesses and diseases is associated with more favorable outcomes. Timely-instituted medical monitoring will reduce the risk of illness and of more severe illness by using medical tests to detect who has been affected by exposure to MMA, and to provide medical intervention that will prevent or reduce the deterioration and long-term health and well-being of Plaintiffs and the Classes they seek to represent. Medical monitoring and testing

procedures, including clinical examinations, exist that make the early detection of exposure to this toxic substance and fumes that were released into the class area as a result of the Chemical Crisis, as well as early detection of illness and disease, both feasible and beneficial.

95.     The increased susceptibility to injuries and irreparable threat to the health of the Plaintiffs and the Class Members resulting from their exposure to MMA can be appropriately mitigated and addressed only by the creation of a comprehensive medical monitoring program, supervised by the Court, and funded by the Defendants, that: (a) notifies individuals who have been exposed to MMA of the potential harm from such exposure and the need for periodic testing and examination; (b) provides early detection and treatment of illness, disease or other injuries caused by exposure to MMA; and (c) gathers and forwards to treating physicians information related to the diagnosis and treatment of injuries and diseases which may result from exposure to MMA.

96.     Establishment of a Court-supervised medical monitoring program can readily assure that the proceeds of any monitoring trust fund are reserved for the provision of and/or reimbursement for the above-referenced examination and testing procedures and related activities, guaranteeing the purely equitable use of any trust fund proceeds. The Court's use of its injunctive powers to oversee and

direct medical monitoring in this case is an appropriate and necessary method of adjudication.

97.    The precise nature, form, extent and duration of Court-ordered diagnostic monitoring, clinical examinations, research activities, and education programs are a matter for the Court to decide, after hearing and consultation with medical, industrial, modeling, and other experts. Class adjudication of the right to this relief is both appropriate and necessary.

98.    The medical monitoring program should (a) be generally supervised by the Court and may be directly managed by a Court-appointed, Court-supervised special master(s) or trustee(s); (b) involve the monitoring of all Class Members by designated physicians under a Court-approved medical treatment and research regiment; and (c) involve the collection of medical data utilized for group studies, as well as monitoring and treatment of individuals. During program administration, Defendants should address issues implicated by program administration as they develop.

## COUNT ONE
## NEGLIGENCE

99.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

100.    The chemical storage tank crisis described herein was caused by the negligence, carelessness and/or recklessness of the Defendants.

CLASS ACTION COMPLAINT

101.    In addition, and in the alternative, the chemical storage tank crisis was caused by a defective, unfit, and/or unsafe equipment, which was in the care, custody, and control of Defendants. Defendants knew or should have known of the dangerous, unfit and/or defective condition of this equipment and are therefore liable for them.

102.    Defendants owed Plaintiffs and the Class a duty to use reasonable care in the handling and storage of hazardous materials. Consistent with industry practices and procedures and applicable regulations, these duties include, but are not limited to, the duty to:

a.  Properly inspect their storage tanks;

b.  To maintain vigilant lookout during the operation of their facility and tanks;

c.  To remedy defects in equipment and remediate or remove from operation all tanks, equipment or tools that are unsafe for use;

d.  To properly calibrate, maintain, test, and operate testing equipment;

e.  To properly develop and implement risk reduction programs;

f.  To properly develop and implement risk-based hazard management programs;

g.  To properly develop and implement safety performance evaluation processes;

41<br>CLASS ACTION COMPLAINT

h. Operate, maintain, inspect and/or repair their facility and tanks in such a way to ensure their safe and proper operation, particularly when handling hazardous materials such as MAA;

i. Utilize appropriate and available technology to ensure timely alerting of any potential problems; implement appropriate policies for the use of such technology including, but not limited to, setting appropriate alarm thresholds and criteria for determining when a potentially dangerous condition exists; and ensuring that such technology is timely and properly inspected and maintained;

j. Ensure proper procedures or systems for timely identifying any malfunctions of the tanks, equipment, or tools in order to prevent or mitigate malfunction while handling such hazardous materials;

k. Ensure a proper mechanism for stopping or slowing malfunctioning tanks in a timely manner to avoid overheating, excessive pressure, and other dangerous conditions while handling such hazardous materials;

l. Adequately staff positions that plan, prepare, coordinate, and oversee handling of hazardous materials;

m. Hire, train, manage, oversee, and supervise their agents, servants, and employees, including but not limited to storage and handling of such hazardous materials, and response to emergency situations;

42
CLASS ACTION COMPLAINT

n. Properly determine the adequacy and skill of their agents, servants, and employees including but limited to storage and handling of such hazardous materials, and response to emergency situations;

o. Adequately warn those in danger of imminent exposure to hazardous chemicals;

p. Institute proper procedures and training for response to the malfunction of tanks storing hazardous materials;

q. Have an emergency response plan to prevent the release and contain the spread of hazardous materials into the surrounding air, water, real property, personal property, and persons in the event of an escape of such materials;

r. Timely implement such an emergency response plan;

s. Handle, transport, store, and maintain hazardous materials in a manner which would not cause Plaintiffs and Class Members harm, as Plaintiffs and Class Members were foreseeable victims located within the scope of the risk created by Defendants' conduct;

t. Properly dispose of or otherwise eliminate the hazardous materials from their facility, including avoiding the use of techniques that would further expose Plaintiffs, Class Members, and the surrounding areas to MMA;

43
CLASS ACTION COMPLAINT

u. Evacuate an appropriate geophysical area to avoid exposing persons or property nearby to hazardous materials and causing injury;

v. Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including MMA, to persons at risk of exposure, including those outside the evacuation zone;

w. Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone; and

x. Contain the spread of hazardous materials, including MMA, into the surrounding air, water, real property, and persons.

103. However, inconsistent with industry practice and procedures and applicable regulations, Defendants negligently, carelessly and/or recklessly breached their duties to Plaintiffs and the Class by, among other things:

a. Failing to properly inspect their storage tanks, equipment, and tools;

b. Failing to maintain vigilant lookout during the operation of their facility and tanks;

c. Failing to remedy defects in equipment and remediate or remove from operation all tanks that are unsafe for use;

d. Failing to properly calibrate, maintain, test, and operate testing equipment;

e. Failing to properly develop and implement risk reduction programs;

CLASS ACTION COMPLAINT

f. Failing to properly develop and implement risk-based hazard management programs;

g. Failing to properly develop and implement safety performance evaluation processes;

h. Failing to operate, maintain, inspect and/or repair their facility and tanks in such a way to ensure their safe and proper operation, particularly when handling hazardous materials such as MAA;

i. Failing to utilize appropriate and available technology to ensure timely alerting of any potential problems; implement appropriate policies for the use of such technology including, but not limited to, setting appropriate alarm thresholds and criteria for determining when a potentially dangerous condition exists; and ensuring that such technology is timely and properly inspected and maintained;

j. Failing to ensure proper procedures or systems for timely identification of any malfunctions of the tanks in order to prevent or mitigate malfunction while handling such hazardous materials;

k. Failing to ensure a proper mechanism for stopping or slowing malfunctioning tanks in a timely manner to avoid overheating, excessive pressure, and other dangerous conditions while handling such hazardous materials;

CLASS ACTION COMPLAINT

l. Failing to adequately staff positions that plan, prepare, coordinate, and oversee handling of hazardous materials;

m. Failing to hire, train, manage, oversee, and supervise their agents, servants, and employees, including but not limited to storage and handling of such hazardous materials, and response to emergency situations;

n. Failing to properly determine the adequacy and skill of their agents, servants, and employees including but limited to storage and handling of such hazardous materials, and response to emergency situations;

o. Failing to adequately warn those in danger of imminent exposure to hazardous chemicals;

p. Failing to institute proper procedures and training for response to the malfunction of tanks storing hazardous materials;

q. Failing to have an emergency response plan to prevent the release and contain the spread of hazardous materials into the surrounding air, water, real property, personal property, and persons in the event of an escape of such materials;

r. Failing to timely implement such an emergency response plan;

s. Failing to handle, transport, store, and maintain hazardous materials in a manner which would not cause Plaintiffs and Class Members harm;

t. Failing to properly dispose of or otherwise eliminate the hazardous materials from their facility, including avoiding the use of techniques that would further expose Plaintiffs, Class Members, and the surrounding areas to MMA;

u. Failing to evacuate an appropriate geophysical area to avoid exposing persons and property nearby to hazardous materials and causing injury;

v. Failing to accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including MMA, to persons at risk of exposure, including those outside the evacuation zone;

w. Failing to accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone;

x. Failing to contain the spread of hazardous materials, including MMA, into the surrounding air, water, real property, personal property, and persons; and

47
CLASS ACTION COMPLAINT

y. Otherwise unreasonably causing injury to Plaintiffs and the Class Members in ways further investigation and discovery will reveal.

104. Defendants owed and breached a duty of reasonable care commensurate with the risk of using, maintaining, storing, handling, disposal, and release of hazardous materials, including MMA.

105. As a direct and proximate result of Defendants' negligent use, maintenance, storage, handling, disposal, and release of hazardous materials, Plaintiffs and Class Members presently suffer and will continue to suffer real property damage, out-of-pocket expense including costs of mandatory evacuation, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated illness or disease, and the present need for medical monitoring to ensure early detection of any such illness or disease.

106. Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

48
CLASS ACTION COMPLAINT

107. Plaintiffs' and Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any illness or disease in the animals as a result of the contamination and exposure to MMA they experienced as a result of the Defendants' activities alleged herein.

108. Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT TWO
## STRICT LIABILITY

109. Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

110. Defendants are strictly liable for the injuries and damages suffered by Plaintiffs and the Class pursuant to the provisions of the Restatement (Second) of Torts §§ 519 and 520.

111. The use, maintenance, storage, handling, disposal, and release of hazardous materials is an abnormally dangerous and/or ultrahazardous activity under the definition set forth in Restatement (Second) of Torts §§ 519 and 520.

112. Defendants engaged in an abnormally dangerous and/or ultrahazardous activity by using, maintaining, storing, handling, disposing of

CLASS ACTION COMPLAINT

and/or releasing hazardous materials in or about a residential community, making them strictly liable for any resulting damages.

113. As a direct and proximate result of the Defendants' abnormally dangerous and/or ultrahazardous activity, Plaintiffs and Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense including costs for mandatory evacuation, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated illness or disease, and the present need for medical monitoring to ensure early detection of any such illness or disease.

114. Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

115. Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any illness or disease in the animal as a result of the

contamination and exposure to MMA as alleged they experienced as a result of Defendants' activities alleged herein.

116.    Accordingly, the Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages to Plaintiffs and the Class Members, which were a direct and proximate result of the chemical storage tank crisis and release of hazardous substances which harmed Plaintiffs and the Class as described above.

117.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## **COUNT THREE**
## **STATUTORY NUISANCE**

118.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

119.    Under California Civil Code § 3479,

> Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substance, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance.

120.   Thus, under California Civil Code § 3479, it is nuisance to emit air pollutants of hazardous materials, such as MMA, that is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property or unlawfully obstructs the free passage or use.

121.   As a result of the chemical storage tank crisis described herein, Defendants emitted impermissible amounts of MMA.

122.   As a result of Defendants' improper use, maintenance, storage, handling, disposal, and release of MMA, Plaintiffs and the Class Members have been exposed to hazardous air pollutants in violation of California law.

123.   As a direct and proximate result of Defendants' improper use, maintenance, storage, handling, disposal, and release of MMA, this toxin continuously invaded and contaminated the areas surrounding Plaintiffs and Class Members, thereby exposing their respective properties and bodies to unsafe levels of MMA.

124.   As a direct and proximate result of Defendants' improper use, maintenance, storage, handling, disposal, and release of MMA, and the exposure to this toxin resulting therefrom, Plaintiffs and Class Members presently suffer, and will continue suffering in the future, real property damage, costs for mandatory evacuation and other out-of-pocket expense, personal property damage, loss of use

and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated illness or disease, and the present need for medical monitoring to ensure early detection of any such disease or illness.

125. Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

126. Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to MMA they experienced as a result of Defendants' activities alleged herein.

127. Plaintiffs and the Classes suffered injuries that are distinct from the injuries suffered by the public at large.

128. Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or

egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT FOUR
## PUBLIC NUISANCE

129.   Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

130.   At all times relevant hereto, Defendants knew or should have known that MMA was hazardous and harmful to real property and human beings, and it was substantially certain that improper use, maintenance, storage, handling, disposal, and release of this material was hazardous and harmful to people living in nearby areas.

131.   Plaintiffs and the Class Members have a common right to enjoy their real property free of dangerous contamination, to breathe clean air and have access to clean running and groundwater without dangerous levels of toxic chemicals, and to live life without unreasonable exposure to toxic chemicals.

132.   Defendants' improper use, maintenance, storage, handling, disposal, and release of MMA substantially and unreasonably infringed upon and transgressed these public rights.

133.   As a proximate result of Defendants' improper use, maintenance, storage, handling, disposal, and release of MMA, Plaintiffs', the Class Members', and the general public's common right to breathe clean air and have access to clean

54
CLASS ACTION COMPLAINT

running water without dangerous levels of toxic and harmful chemicals was severely diminished, if not eliminated.

134.    As a proximate result of Defendants' improper use, maintenance, storage, handling, disposal, and release of MMA, Defendants invaded and contaminated the areas surrounding Plaintiffs' and Class Members' residences, thereby exposing them to toxic chemicals.

135.    Each of the Plaintiffs and Class Members suffered injuries that are distinct from the public at large because their individual real and personal property rights have been unreasonably interfered with.

136.    As a direct and proximate result of Defendants' creation of a public nuisance and the public's exposure to toxic chemicals resulting therefrom, Plaintiff and Class Members presently suffer, and will continue to suffer, real property damage, costs for mandatory evacuation and other out-of-pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, the necessity for annoyance, upset, aggravation and inconvenience, increased risk of associated illness or disease, and the present need for medical monitoring to ensure early detection of any such disease or illness.

137.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure

they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

138. Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to MMA they experienced as a result of Defendants' activities alleged herein.

139. Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT FIVE
## PRIVATE NUISANCE

140. Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

141. At all times relevant hereto, Defendants knew or should have known that MMA is hazardous and harmful to real property and human beings, and it was substantially certain that improper use, maintenance, storage, handling, disposal,

CLASS ACTION COMPLAINT

and release of this material would cause injury to Plaintiffs and the Class Members and their property.

142. Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated real property located in a radius to be determined through discovery surrounding the Garden Grove site.

143. Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have released MMA onto Plaintiffs' and the Class Members' land and have contaminated Plaintiffs' and the Class Members' real property, water and persons.

144. The Defendants' contamination of Plaintiffs' and the Class Members' property with MMA has unreasonably interfered with the rights of Plaintiffs and the Class Members to use and enjoy their property, causing them to suffer injuries different in kind and degree from others in surrounding areas. Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from occupying or using their real properties, using contaminated water to drink, cook, bathe, irrigate farmland and gardens, eat from home gardens, or water pets and livestock. This has, in turn, caused significant loss of income, out-of-pocket expenses, loss of use and enjoyment and inconvenience.

145.   Defendants' conduct has also substantially interfered with Plaintiffs' and the Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that they so choose. It has also reduced the value of their land.

146.   Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs and the Class Members.

147.   Plaintiffs and the Class Members, unlike the public generally, have suffered specific injuries as a result of Defendants' tortious, illegal, and wrongful conduct, including the pollution of their land and water.

148.   Defendants' improper use, maintenance, storage, handling, disposal, and release of MMA and the contamination of Plaintiffs' and the Class Members' property resulting therefrom, constitutes a private nuisance. This nuisance has directly and proximately caused Plaintiffs and the Class Members to presently suffer, and continue suffering in the future, real property damage, out-of-pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated

illness or disease, and the present need for medical monitoring to ensure early detection of any such disease or illness.

149.   Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

150.   Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to MMA they experienced as a result of Defendants' activities alleged herein.

151.   Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

### COUNT SIX
### TRESPASS

152.   Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

59
CLASS ACTION COMPLAINT

153.   At all times relevant hereto, Defendants knew or should have known MMA to be hazardous and harmful to real property, animals, and human beings, and it was substantially certain that their use, emission, discharge, disposal, distribution, spreading and/or release of these hazardous materials would cause injury to Plaintiffs and Class Members and their property.

154.   Defendants, through their activities alleged herein, caused hazardous materials to enter and contaminate Plaintiffs' and the Class Members' property. They intentionally, knowingly, and negligently used, discharged, spread, deposited and/or released these hazardous materials knowing that those toxins would contaminate the real property and drinking water of individuals like Plaintiffs and the Class Members.

155.   Defendants, through their activities alleged herein, authorized, requested, or caused others to dispose of waste in a manner which they knew was substantially likely to cause hazardous materials, including MMA, to enter and contaminate Plaintiffs' and the Class Members' properties. Through their actions in intentionally causing others to spread their waste, they intentionally, knowingly, and negligently caused hazardous materials to enter Plaintiffs' and the Class Members' land and water.

156. At all relevant times Defendants were aware that their conduct in disposing of MMA was contrary to Plaintiffs' and the Class Members' rights in their property.

157. At all times, Defendants' conduct displayed indifference to and disregard for Plaintiffs' and the Class Members' rights to their property.

158. Defendants, through their activities regarding hazardous materials alleged herein, failed to act in the manner of an ordinary, careful person or business.

159. The Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' and the Class Members' real and personal property with hazardous materials has interfered with the rights of Plaintiffs and the Class Members to use and enjoy their property and constitutes trespass and continuing trespass. Defendants' trespass has substantially impaired Plaintiffs' and the Class Members' rights in the use and enjoyment of their property as well as economic and property damages as alleged herein.

160. Defendants' trespass has proximately caused, and will continue to cause, Plaintiffs and the Class Members real property damage, costs of mandatory evacuation and other out-of-pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

161. Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

162. Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any illness or disease in the animal as a result of the contamination and exposure to MMA they experienced as a result of Defendants' activities alleged herein.

163. Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT SEVEN
## TRESPASS TO CHATTELS

164. Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

165. At all relevant times, Plaintiffs and the Class Members had a possessory interest in all their personal property, including but not limited to

62
CLASS ACTION COMPLAINT

personal vehicles, commercial vehicles, household goods, food, professional equipment, recreational equipment, livestock, and pets.

166. Defendants, through their activities alleged herein, caused the impairment of Plaintiffs' and the Class Members' property as to its condition, quality, or value and harmed Plaintiffs' materially valuable interest in the same.

167. Defendants, through their activities alleged herein, deprived Plaintiffs and the Class Members of the possession or use of their chattel for a substantial time.

168. Defendants, through their activities alleged herein, caused harm to property in which Plaintiffs and the Class Members had or have a legally protected interest.

169. At all relevant times Defendants were aware that their conduct in using, maintaining, storing, handling, disposing of and/or releasing MMA was contrary to Plaintiffs' and the Class Members' legally protected interest in their personal property.

170. The Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' and the Class Members' personal property substantially impaired Plaintiffs' and the Class Members' legally protected interest in their property as well as economic and property damages as alleged herein.

63
CLASS ACTION COMPLAINT

171. Defendants' trespass has also interfered with and continues to interfere with Plaintiffs' and the Class Members' ability to enjoy their personal property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that Plaintiffs and the Class Members so choose.

172. Defendants' trespass has proximately caused, and will continue to cause, Plaintiffs and the Class Members personal property damage, costs for mandatory evacuation and other out-of-pocket expense, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience. These damages include, but are not limited to, the contamination and/or death of livestock and pets, and the contamination of personal vehicles, commercial vehicles, household goods, food, professional equipment, and recreational equipment.

173. Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

CLASS ACTION COMPLAINT

174. Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to MMA they experienced as a result of Defendants' activities alleged herein.

175. Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT EIGHT
## MEDICAL MONITORING

176. Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

177. Plaintiffs and the Class Members have been exposed to significant amounts of MMA at levels that are far higher than any normal background levels. This toxic substance is dangerous and has been proven to cause severe health complications, including illnesses and diseases, in humans.

178. Plaintiffs and the Classes were exposed to MMA as a direct and proximate result of Defendants' tortious actions, including Defendants' negligent, ultrahazardous, and willful and wanton conduct as alleged herein.

179.   As a proximate result of their exposure to MMA, Plaintiffs and the Classes have a significantly increased risk of developing illnesses and diseases, including but not limited to damage to or illnesses or diseases of the lungs, kidneys or liver. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

180.   This increased risk would warrant a reasonable physician to order monitoring.

181.   Early diagnosis of these diseases and conditions has significant value for Plaintiffs and the Class Members because such diagnoses will help them monitor and minimize the harm therefrom.

182.   Monitoring procedures exist that make early detection of these diseases and conditions possible and beneficial. These monitoring procedures are different from those normally recommended in the absence of toxic exposures and are reasonably necessary as a direct and proximate result of Plaintiffs' and the Class Members' exposures to the toxic substance MMA, as a result of Defendants' actions as alleged herein.

183.   As a direct and proximate result of Plaintiffs' and the Class Members' exposure to the toxic substance and fumes, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection and diagnosis of harmful and debilitating injuries

potentially resulting from exposure to the toxic substance and fumes, as a remedy for the conduct alleged.

184. As a result, Plaintiffs and the Classes should be awarded the quantifiable costs of such a monitoring regime.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, respectfully request that the Court enter judgment in their favor and against Defendants, including jointly and severally as warranted, as follows:

A.    For an Order certifying the Classes, as defined herein, and appointing Plaintiffs and their Counsel to represent the Classes;

B.    For damages, including compensatory, punitive, and exemplary damages, in an amount determined just and reasonable;

C.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

D.    For prejudgment and post-judgment interest on all amounts awarded;

E.    For injunctive and declaratory relief, as allowed by law, including medical monitoring; and

F.    Such other and further relief as this Court may deem just and proper.

CLASS ACTION COMPLAINT

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: May 28, 2026

Respectfully submitted,

**KABATECK LLP**

/s/ *Marina Pacheco*
BRIAN KABATECK, ESQ.
bsk@kbklawyers.com
SHANT KARNIKIAN, ESQ.
sk@kbklawyers.com
633 West Fifth Street, Suite 3200
Los Angeles, CA 90071
Tel:  (213) 217-5027

CHRISTOPHER A. SEEGER, ESQ.*
cseeger@seegerweiss.com
STEPHEN A. WEISS, ESQ.*
sweiss@seegerweiss.com
DAVID R. BUCHANAN, ESQ.*
dbuchanan@seegerweiss.com
JUSTIN M. SMIGELSKY, ESQ.*
jsmigelsky@seegerweiss.com
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Tel:  (973) 639-9100
*Pro hac vice* forthcoming

*Attorneys for Plaintiffs and
    the Putative Class*

68
CLASS ACTION COMPLAINT